UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANET E. ALLEN,

    Plaintiff,

       v.

JANET NAPOLITANO, in her official capacity as the Secretary of the U.S. Department of Homeland Security,

    Defendant.

Civil Action No. 09-02228 (JDB)

## MEMORANDUM OPINION

Defendant Janet Napolitano, Secretary of the United States Department of Homeland Security, has moved for summary judgment on the remaining claims of plaintiff's retaliation complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. Plaintiff Janet Allen was the Director of Internal Controls in the Office of Assurance and Compliance within the United States Immigration and Customs Enforcement ("ICE"), a component of the Department of Homeland Security. Allen's remaining claims allege that her supervisor, Kathy Hill, unlawfully retaliated against Allen by not including her in certain meetings and by giving Allen an overall rating of Achieved Expectations for the 2008 performance review period. For the reasons explained below, the Court will grant the Department's motion for summary judgment.

## BACKGROUND

The Court's prior opinion lays out the background to this case in more detail. See Memorandum Opinion [Docket Entry 17] (Mar. 31, 2011). During the events in question,

plaintiff Janet Allen was the Director of Internal Controls in the Office of Assurance and Compliance within ICE, a GS-15 position under the government's General Schedule pay scale. See Pl.'s Resp. to Statement of Material Facts [Docket Entry 40-17] ¶ 2 (Jan. 24, 2013) (SOMF).[1] The Office of Assurance and Compliance served an auditing function within ICE, evaluating its internal financial control systems, identifying deficiencies and, where appropriate, developing and overseeing corrective action plans. Id. ¶ 9. The Office also reported results of internal control testing and audit-related activities within the Department. Id.

In 2006, Allen filed a complaint of retaliation and discrimination with the Equal Employment Opportunity (EEO) office. Her claims, not themselves relevant here, arose out of actions Allen's then-supervisor Debra Bond took in 2005 and 2006. See Compl. [Docket Entry 1] ¶¶ 7-10 (Nov. 24, 2009). Allen entered an out-of-court settlement agreement with the Department in February 2008 to resolve those claims. See SOMF ¶ 4. Allen's supervisor, Kathy Hill, learned of the settlement because she had to implement certain terms, namely issuing Allen a retroactive performance appraisal review rating of "Outstanding" for the 2005 to 2007 rating periods. See id. ¶ 6. In March and April 2008, Allen complained to Hill that retaliation was motivating Hill's formulation of Allen's performance work plan. See id. ¶ 8. Hill presented Allen with a revised performance work plan on May 23, 2008. Id.

That November, Hill gave Allen an overall performance rating of Achieved Expectations. Id. ¶ 16; see also 2008 Performance Plan and Appraisal [Docket Entry 40-1] at 14 (Jan. 24, 2013) (overall ranking of 2.6 on 0 to 4 scale, i.e., Achieved Expectations). Allen was evaluated based on four performance goals (which accounted for 60% of her rating) and on seven core

---

[1] The Court must view all facts in the light most favorable to the plaintiff; accordingly, SOMF citations are to facts not disputed in relevant part or to facts contained in Allen's objection to the purportedly undisputed fact.

competencies (which together accounted for the remaining 40%). Id. ¶ 17. Hill rated Allen as "Achieved Excellence," the highest rating, on two performance goals. She rated Allen as "Exceeded Expectations," the second highest rating, on performance goal 2, and "Achieved Expectations," the next highest—and second-lowest—rating on performance goal 3. Finally, Hill rated Allen "Achieved Expectations" on six of the core competencies, and "Exceeded Expectations" on the remaining core competency. See id. ¶ 17. The performance plan required written justification only of a rating above or below "Achieved Expectations." See 2008 Performance Plan and Appraisal at 14. Nonetheless, in issuing the review, Hill included a narrative discussion of issues that were the basis for the review. See SOMF ¶ 20.

Beginning in November 2008, Hill conducted a number of meetings without Allen that were related to projects on which Allen was working. See Allen EEO Decl. [Docket Entry 40-4] ¶¶ 19-26, 29 (Jan. 24, 2013). For instance, Allen was responsible for overseeing the work of contractor PriceWaterhouseCoopers on one kind of internal control testing. But she was not invited to and did not attend certain meetings between Hill and PriceWaterhouseCoopers. Similarly, Allen did not participate in certain meetings with different contractors about remedying the deficiencies Allen's team identified. See Pl.'s Opp'n to Mot. for Summ. J. [Docket Entry 40] at 5, 7 (Jan. 24, 2013).

Allen filed this action in 2009 challenging the implementation of her 2008 settlement agreement, alleging a number of instances of retaliation, and asserting a hostile work environment. Before discovery could occur, the Department moved to dismiss or, in the alternative, for summary judgment. The Court granted in part the Department's motion. The parties have now completed discovery, and the Department has moved for summary judgment on the remaining claims.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. Moreover, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## ANALYSIS

I. **Exclusion from Meetings**

Allen alleges that Hill excluded her from certain meetings relevant to her job, and that this amounted to an adverse action. To establish an actionable event for a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). An action is materially adverse when "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." See id. (internal quotation marks omitted). An employment-related action challenged as retaliatory must "result in materially adverse consequences affecting the terms, conditions, or privileges of the plaintiff's employment." Pardo-Kronemann v. Donovan, 601 F.3d 599, 607 (D.C. Cir. 2010) (internal quotation marks omitted). "For employment actions that do not obviously result in a significant change in employment status . . . an employee must go the further step of demonstrating how the decision nonetheless caused . . . an objectively tangible harm." Douglas v. Donovan, 559 F.3d 549, 553 (D.C. Cir. 2009). Further, "a tangible employment action in most cases inflicts direct economic harm." Id. at 552 (alteration and internal quotation marks omitted). While "objectively tangible harm" supports a Title VII action, "purely subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation," do not. Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006) (internal quotation marks omitted). Thus, "not everything that makes an employee unhappy is an actionable adverse action." Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001) (internal quotation marks omitted).[2]

---

[2] Although the scope of Title VII's antiretaliation provision "extends beyond workplace-related or employment-related retaliatory acts and harm," Burlington N. & Santa Fe Ry. Co., 548 U.S. at 67, here Allen alleges a workplace-related retaliatory act. Accordingly, the same standard for an adverse action applies as in the discrimination context. See Pardo-Kronemann, 601 F.3d at 607 (applying "materially adverse consequences affecting the terms, conditions, or privileges of the plaintiff's employment" test from discrimination context in retaliatory transfer action); see also Morrison v. Mills, No. 10-2329, 2013 WL 874380, at *4 (D.D.C. Mar. 11, 2013)

The Court declined to dismiss this claim before discovery because Allen could have developed evidence that the non-participation in certain meetings resulted in the requisite objectively tangible harm. See Memorandum Opinion at 17. Discovery, now completed, has revealed the contrary. The undisputed evidence establishes that Hill was in a number of meetings each day and as a result made her Outlook calendar, listing her meeting schedule, available to subordinates including Allen so they could ask to participate in any meeting on her schedule. See SOMF ¶ 55; see also Allen Decl. [Docket Entry 40-9] ¶ 22 (Jan. 24, 2013). While Allen points out that Hill never told Allen the calendar was available and she learned about it "accidentally," Allen Decl. ¶ 22, she does not dispute that she knew she had access to the calendar at the time of the meetings at issue. And Allen has not identified a single specific meeting in which she asked to participate only to be rejected by Hill. See SOMF ¶¶ 56-57. Accordingly, rather than exclusion from meetings, what is really at issue is Hill's failure to affirmatively invite Allen. It is doubtful that an employer's decision not to invite an employee to a meeting when the employee can request to participate would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." See Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68 (internal quotation marks omitted).

In any case, even setting aside Allen's ability to participate despite not being invited, Allen has failed to identify any materially adverse consequences affecting the terms and conditions of her employment resulting from her nonparticipation in the meetings. She has pointed to no effects on her grade level, salary, or promotion opportunities. Indeed, Allen achieved an "Exceeded Expectations" rating on her performance review for the relevant period.

---

(explaining that "where the alleged retaliatory action is employment-related the standard for an adverse action is functionally identical to that in the discrimination context").

See SOMF ¶ 51. Allen argues that her non-presence at certain meetings created confusion with the contractors, and hurt her authority in their eyes. But a "poor performance evaluation . . . merely causing a loss of prestige or status is not actionable." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 377 (4th Cir. 2004). So, too, a non-invitation (or even exclusion) from a meeting that causes a loss of status is not actionable absent evidence of objectively tangible harm. See Douglas, 559 F.3d at 553; see also Holcomb, 433 F.3d at 902 ("loss of reputation" is a nonactionable subjective injury). Because Allen has offered no evidence of any tangible impact (let alone direct economic harm) from her non-presence at meetings or from any resulting confusion, she has not shown that exclusion from meetings would amount to an adverse action.

In arguing that she has established an adverse action, Allen relies on the Supreme Court's example in Burlington that "to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 69. But she omits the Supreme Court's preceding sentence—that "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight." Id. Here, the very problem is that Allen has failed to point to any record evidence that the meetings would have contributed significantly to her professional advancement or that non-participation otherwise tangibly impacted the terms and conditions of her employment. Accordingly, the record reflects that the non-invitations were, at most, nonactionable petty slights.

Absent specific evidence of harm from the exclusion, summary judgment for the Department on this claim is warranted. As the D.C. Circuit has explained, "the objectively tangible harm requirement . . . guards against both judicial micromanagement of business

7

practices and frivolous suits over insignificant slights." Russell, 257 F.3d at 818 (internal quotation marks omitted). Allen would have this Court—rather than her supervisor—decide which of many routine meetings warrant her presence. See Baloch v. Kempthorne, 550 F.3d 1191, 1197 (D.C. Cir. 2008) (declining to engage in "judicial micromanagement of business practices" by second-guessing employers' decisions about "which of several qualified employees will work on a particular assignment" (internal quotation marks omitted)). Her challenge is particularly inapt because Allen herself had the power to request attendance at these meetings, but never exercised it.[3]

## II. Allen's 2008 Performance Evaluation

The Court will turn, then, to Allen's second claim—that her 2008 performance evaluation of "Achieved Expectations" was retaliatory. As a threshold matter, the performance evaluation does constitute an adverse action. Allen's evaluation was satisfactory, and so "not adverse in an absolute sense." Brown v. Brody, 199 F.3d 446, 458 (D.C. Cir. 1999). Such performance evaluations are not inherently adverse. See Russell, 257 F.3d at 819 ("in most circumstances performance evaluations alone at the satisfactory level or above should not be considered adverse employment actions"). But the evidence, viewed in the light most favorable to Allen, establishes that the evaluation caused objectively tangible harm by making her ineligible for a bonus. See Pl.'s Interrog. Resps. [Docket Entry 37-3] ¶ 1 (Dec. 14, 2012) (stating that Allen received a $2300 monetary award with her 2009 "Exceeded Expectations" rating and a $4000 reward with her 2010 "Achieved Excellence" rating). The denial of a bonus "is objectively tangible because it has a direct, measurable, and immediate effect upon the employee's

---

[3] Because the Court concludes that the exclusion from meetings is not an adverse action, the Court need not consider the Department's asserted legitimate, non-discriminatory reason for Hill's actions.

compensation." Douglas, 559 F.3d at 553 (internal quotation marks omitted); see also Baloch, 550 F.3d at 1199 ("performance reviews typically constitute adverse actions only when attached to financial harms"). Accordingly, the 2008 performance review constitutes an adverse action.[4]

The parties dispute whether Allen has established a prima facie case of retaliation, namely whether she has established a causal connection between her protected activity and the performance review. The Court, however, need not consider this dispute because the Department has asserted a legitimate, non-discriminatory reason for the challenged decision—that it accurately reflects Allen's performance during the review period. In such a case, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee . . . ?" Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).

### A. Pretext in Justifying Performance Goal 2 Rating

In opposing the Department's motion, Allen takes issue with Hill's explanation of her rating for performance goals 2 and 3. See Pl.'s Opp'n at 20-22. She has not challenged the ratings on the seven core competencies.[5] Hill rated Allen as "Exceeded Expectations" for performance goal 2. Although "Exceeded Expectations" is the second highest rating, and even though overall performance at this level would qualify an employee for a monetary award, see Pl.'s Interrog. Resps. ¶ 1, Allen argues that a jury could find Hill's rating on this performance

---

[4] The Department also seeks summary judgment on Allen's claim to damages from lost promotional opportunities caused by the 2008 performance evaluation. It argues that Allen was unable to identify either a single position to which she applied and for which she was required to submit her performance review or a single position to which she refrained from applying due to the challenged performance appraisal. See also Douglas, 559 F.3d at 556 ("the harm resulting from a single performance evaluation viewed in isolation is speculative"). Allen has failed to respond to this argument. Accordingly, she has forfeited any objection on this issue.

[5] Although Allen's statement of facts references some incidents relevant to the core competencies ratings, she makes no mention of these ratings in the argument section of her opposition.

goal retaliatory. Specifically, Allen contests two reasons Hill provided for the rating: that Allen failed to effectively collaborate with one of ICE's finance centers, the Burlington Finance Center (BFC), and that Allen's lack of oversight and coordination with the PriceWaterhouseCoopers contractors caused delays in the Test of Operating Effectiveness, a test to identify deficiencies in internal payment control.

Finance centers are ICE program offices where payments are actually processed and where some supporting documentation is maintained. See Hill Decl. [Docket Entry 37-2] ¶ 9 (Dec. 14, 2012). Allen first argues that BFC was the subject of the audit, so it was "neither proper nor expected for Ms. Allen to collaborate with them on the audit findings." Pl.'s Opp'n at 20. This argument is at odds with the performance plan, which required Allen to "[c]ollaborate with . . . ICE Program Offices to eliminate the issues that would prevent an[] unqualified audit opinion." 2008 Performance Plan and Appraisal at 3. Moreover, the Department argues—and Allen does not dispute—that Hill received a complaint from BFC management about Allen's failure to obtain feedback from BFC before revising and finalizing certain drafts that BFC had prepared. BFC employees complained that, because they had no opportunity to review the changes, they were confused as to what the findings were and what remediation was needed when they received the final document. See Hill Decl. ¶¶ 9, 17; see also SOMF ¶ 23.

Crediting, as the Court must, Allen's statement about general auditing practices, see Allen Decl. ¶ 4 ("[a]s a general matter, an auditee does not have input into the auditor's evaluation of their work; nor is it customary for an auditor to seek an auditee's agreement"), the Court will assume that Allen has created a genuine dispute over the objective validity of Hill's criticism. That, however, does not end the inquiry. A defendant "could prevail on its motion for summary judgment, despite a genuine dispute over the objective validity of its reasons, if it were

10

able to demonstrate the absence of a genuine dispute in the record over whether [the official] honestly and reasonably believed in those reasons." George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005). It must be so: to survive summary judgment, Allen cannot merely show that the rating she received was subject to reasonable dispute; such a showing would thrust the Court and jury into the role of a super-personnel department determining the optimal evaluation of an employee years after the fact. See Forman v. Small, 271 F.3d 285, 291 (D.C. Cir. 2001) ("Consistent with the courts' reluctance to become involved in the micromanagement of everyday employment decisions, the question before the court is limited to whether [plaintiff] produced sufficient evidence of [retaliation], not whether [s]he was treated fairly or otherwise entitled to" a better outcome (citations omitted)). Hence, Allen cannot prevail simply by showing that Hill's justification is arguable. Rather, she must show that Hill's explanation is pretextual.

      The objective invalidity of a reason can demonstrate that the reason was pretextual, but that is only so where the error is "too obvious to be unintentional." Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996); see also Carpenter v. Fed. Nat'l Mortg. Ass'n, 174 F.3d 231, 236 (D.C. Cir. 1999) ("absent error too obvious to be unintentional, court respects employer's unfettered discretion to evaluate employees" (internal quotation marks omitted)). Put another way, Allen must show that Hill's evaluation was "so ill-justified as to allow a jury to conclude that they were not the actual reasons and that [she] suffered retaliation for [her] discrimination complaints." Baloch, 550 F.3d at 1200; cf. Holcomb, 433 F.3d at 897 ("In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." (internal quotation marks omitted)).

There is no such obvious error here. First, coordinating with the program offices subject to the internal audit was a requirement of the performance plan. See Forman, 271 F.3d at 293 (rejecting a plaintiff's argument that criticism for not completing a task was pretextual because "[i]t is undisputed that [plaintiff's] performance plans for the relevant period called for him to" complete that task). And Allen has not indicated that Hill was aware that such communication was nonetheless improper. For instance, Allen does not argue that she communicated to Hill the impropriety of requiring collaboration with the program office, or that Hill had acknowledged it. Nor does Allen's statement about accepted accounting approaches establish that the bar on communication should apply to the internal auditing processes at issue, which sought to prepare ICE for a formal outside audit. Finally, the undisputed record shows that BFC actually lodged a complaint about Allen's failure to communicate with them. Therefore, even assuming that Allen should not have been expected to coordinate with BFC, there is no basis for a reasonable jury to find that Hill's asserted belief that that such coordination was a requirement of Allen's position was dishonest or a pretext. Allen has hence created no genuine dispute of material fact as to Hill's honestly held belief in this criticism of Allen's performance.

In contesting Hill's rating for performance goal 2, Allen also disputes the assessment that her lack of oversight and coordination with PriceWaterhouseCoopers caused delays in the Test of Operating Effectiveness. Allen offers an alternative explanation for any delay—the significant expansion of the project's scope. She also notes that Hill "never told [her] that she needed to increase her oversight and coordination with [PriceWaterhouseCoopers] contractors." Pl.'s Opp'n at 20. But again, Allen has offered no reason to doubt the honesty of Hill's explanation. Although the delay (which Allen admits occurred) could have had multiple causes, Allen has pointed to no record evidence ruling out inadequate coordination as a cause. And indeed, the

performance plan required Allen to "collaborate[] effectively with others" to "[e]nsure" that the "Test of Operating Effectiveness (TOE) is completed" by the deadline. See 2008 Performance Plan and Appraisal at 4. Allen, then, has failed to show that Hill's explanation—that "although this project was time consuming, I believed that if it had been managed effectively, it could have been completed in the original deadlines," Hill Decl. ¶ 18—is pretextual. And Hill's lack of an explicit instruction that Allen increase her oversight does not show that the reason was pretextual. Allen fails to explain why Hill could not have reasonably expected Allen, a GS-15 supervisory employee, to take the initiative and carry out the coordination that was part of her performance plan without express reminders to do so. That is particularly stark in light of the rating Hill gave, evaluating Allen as Exceeding Expectations, although short of Achieving Excellence; Allen has not explained why Hill's stated expectations for Achieved Excellence performance are so unreasonable as to create an inference of pretext.

Finally, Allen argues that Hill's explanation is contradictory because in addressing Allen's exclusion from meetings claim during discovery, Hill stated that Allen held weekly status meetings with PriceWaterhouseCoopers "where [Allen] was updated by them." See Hill Decl. ¶ 39. Allen argues that this statement, made to explain why Allen was not invited to certain meetings with the contractor in late 2008 and 2009, shows the dishonesty of Hill's oversight and coordination explanation for this performance goal. Not so. The referenced meetings occurred after the 2008 performance review period, and so say little about Allen's coordination with the contractor during the period evaluated in the challenged review. Indeed, Allen's performance rating was higher for the subsequent review period, potentially reflecting improved coordination. The existence of regular meetings, moreover, does not substitute for effective oversight and coordination, especially given that documented delays occurred in the 2008 testing. Accordingly,

Hill's statement about weekly status meetings is entirely consistent with her criticism on the 2008 performance review.

### B. Pretext in Justifying Performance Goal 3 Rating

On the performance evaluation, Hill explained the rating of "Achieved Expectations" for goal 3 by pointing to Allen's "lack of coordination with the finance centers to ensure they were performing the improper payment testing correctly" and were timely receiving documents. See 2008 Performance Plan and Appraisal at 15 (Hill's narrative). The performance plan for this goal required Allen to "hold[] subordinates accountable" and "collaborate[] effectively with others" to "[e]nsure" that the deadlines in the performance goal were met. Id. at 5. Allen does not dispute— and contemporaneous emails between her and Hill demonstrate—that problems occurred with meeting the deadlines set out in the performance goal. Allen was aware in May 2008 that the finance centers were having difficulty assessing documentation for the improper payment testing. See SOMF ¶ 25. Allen did not get directly involved with monitoring the status of document collection. Id. ¶ 27; see also Email from Janet Allen to Kathy Hill (Nov. 20, 2008) [Docket Entry 40-11] at 2 (Jan. 24, 2013) (explaining that Allen's subordinate Melissa Crane "was responsible for monitoring the status of documentation collection and for coordinating with the finance centers" and that Crane "did not express a need for [Allen's] direct involvement"). On July 18, 2008, less than two weeks before the then-scheduled deadline, Hill asked Allen to advise her on the status of the missing documentation. See SOMF ¶ 29. Allen responded by explaining that the absence of documentation resulted from Hill's "high risk decision" of having the finance centers carry out the testing that "did not work out well" and stating that she could not "envision a strategy" that would enable the agency to meet its deadline. Id. ¶¶ 31-32 (internal quotation marks omitted). Allen also indicated that 10 of the 302 missing documentation items had been

located. Id. ¶ 32. Undisputed evidence further establishes that Hill ultimately intervened and directed the efforts to locate missing documentation to resolve the situation. Id. ¶ 33.[6] Given the undisputed evidence of problems in completing the testing, summary judgment for the Department is appropriate even if the employee argues that the supervisor "was (or should have been) satisfied with her performance," Vatel v. Alliance of Auto. Mfrs., 627 F.3d 1245, 1247 (D.C. Cir. 2011), because a dispute about the underlying relationship does not create a genuine dispute about the supervisor's honest belief in the reasons given. See id. ("it is [the employer's] perception that is relevant").

Notwithstanding this undisputed evidence, Allen argues that Hill's explanation is pretextual because Hill praised Melissa Crane, another employee, for the same work. An inconsistency in treatment of similarly situated employees can create an inference of pretext. See Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO, 548 F.3d 137, 145 (D.C. Cir. 2008) ("One way to discredit an employer's justification is to show that similarly situated employees . . . received more favorable treatment."). But Allen has failed to identify any evidence that could support finding an inconsistency here. First, as Crane's direct supervisor, Allen herself gave Crane the positive review; Hill simply approved that rating. Of course, this distinction is not itself conclusive because Allen has pointed to evidence that Hill praised Crane's work and encouraged the high rating and a bonus for Crane, see Allen Decl. ¶¶ 8-9, and a reasonable jury could infer pretext from Hill's contradictory assessment of the same work. But the differences between Crane and Hill go deeper. Allen is a GS-15 employee who supervised Crane (a GS-12

---

[6] Allen agrees that the program offices "were less responsive to Ms. Allen's requests for documentation than they were to Ms. Hill's." SOMF ¶ 33; see also Allen Decl. ¶ 21 ("[T]hese entities lost respect for me and were not responsive to my requests for documentation. However, when Ms. Hill made requests, available documentation was provided.").

or GS-13 employee) and bore ultimate responsibility for "collaborat[ing] effectively with others" to "[e]nsure" compliance with deadlines. See 2008 Performance Plan and Appraisal at 5. Crane, on the other hand, was responsible for day-to-day coordination with the finance centers, and Allen explained that she "did not fault [Crane] for the finance center's inability to timely and accurately perform the testing." SOMF ¶ 28. Hill expected Allen, "as a senior accountant" to foresee problems before they arose and to guide them to resolution. See 2008 Performance Plan and Appraisal at 15 (Hill's narrative).

Given these vastly different roles, Hill's criticism of Allen as an insufficiently effective leader is entirely consistent with praise of Crane's day-to-day work on the project. See Royall, 548 F.3d at 145 (explaining that to infer pretext from different treatment of a similarly situated employee the "relevant aspects of [her] employment" must be "nearly identical" (internal quotation marks omitted)). And the record reflects that, although Hill ultimately had to step into Allen's role of managing the project, Crane's lower-level day-to-day work was executed effectively. Indeed, Hill noted that after she intervened in the project, she was impressed by Crane's work ethic in providing the needed support. See Hill Supplemental Decl. ¶ 5 [Docket Entry 42-3] (Mar. 4, 2013). Accordingly, the evidence that Hill praised Crane's work fails to support an inference that Hill's criticism of Allen's leadership of the project was pretextual. See Holcomb, 433 F.3d at 899 ("The two pieces of evidence [plaintiff] advances do not give rise to the level of contradiction or 'misstatement' that could be the basis for a reasonable jury to find unlawful animus.").

### C. Procedural Irregularities

Allen also argues that the Department deviated from its procedures by failing to give her a mid-year review. True, deviation from procedures can allow a reasonable jury to infer that an

improper motive was at work. But nothing here establishes that Hill deviated from procedures. While Allen received no mid-year evaluation, this was because her performance plan was finalized in May 2008, see SOMF ¶ 8, eight months into the performance period. See Hill Decl. ¶ 11. Additionally, the events giving rise to Hill's criticisms of Allen's performance, as well as being described contemporaneously on the review, are documented in a number of email exchanges between Hill and Allen at the time of the events in question. The record thus provides no support for Allen's argument of irregularity or the implication of unfair surprise.

Ultimately, there is nothing in the record—no evidence of irregularities, inconsistencies, or explanations that are obviously unjustified—to support a finding of pretext. "Consistent with the courts' reluctance to become involved in the micromanagement of everyday employment decisions, the question before the court is limited to whether [plaintiff] produced sufficient evidence of [retaliation], not whether [s]he was treated fairly or otherwise entitled to" a better outcome—in this case, a better review. Forman, 271 F.3d at 291 (citations omitted). Accordingly, the Court need not conclude that the performance review was fair to Allen or that it was the most accurate assessment of her performance. Neither the Court nor a jury are well-positioned to make that assessment. Rather, the Department must prevail because the evidence creates no dispute as to the honesty of Hill's belief in the stated reasons, and hence provides no basis for a reasonable jury to find that the Department's explanation of Allen's evaluation is pretextual.

## **CONCLUSION**

For these reasons, defendant's motion for summary judgment will be granted. A separate order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: May 6, 2013